# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MKE HOLDINGS, LTD. and DAVID W. BERGEVIN, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | C.A. No. 2018-0729-BWD |
| KEVIN SCHWARTZ, DAVID BUCKERIDGE, ANGELOS DASSIOS, DAVID BROWNE, ROBERT BERENDES, JEFFREY R. GROW, ALEXANDER CORBACHO, and PAINE SCHWARTZ PARTNERS, LLC, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## POST-TRIAL MEMORANDUM OPINION

Date Submitted: February 6, 2026
Date Decided: March 11, 2026

Thomas E. Hanson, Jr., William J. Burton, BARNES & THORNBURG LLP, Wilmington, DE; *Attorneys for Plaintiffs MKE Holdings, LTD. and David W. Bergevin*.

Blake Rohrbacher, Matthew W. Murphy, Sandy Xu, RICHARDS, LAYTON & FINGER, P.A., Wilmington, DE; OF COUNSEL: John F. Hartmann, KIRKLAND & ELLIS LLP, Chicago, IL; John P. Del Monaco, Amanda Lamothe-Cadet, Emma Horne, KIRKLAND & ELLIS LLP, New York, NY; *Attorneys for Defendants Kevin Schwartz, David Buckeridge, Angelos Dassios, David Browne, Robert Berendes, Jeffrey R. Grow, Alexander Corbacho, and Paine Schwartz Partners, LLC*.

**DAVID, V.C.**

This post-trial decision resolves claims for fraud, breach of an operating agreement, and aiding and abetting fraud arising from an equity raise used to partially fund Verdesian Life Sciences, LLC's ("Verdesian") acquisition of Specialty Fertilizer Products ("SFP") in July 2014. The plaintiffs were members of Verdesian who exercised preemptive rights to participate in the equity raise. The defendants include Verdesian's former private equity sponsor, Paine Schwartz Partners, LLC ("Paine"), and former members of Verdesian's board of managers.

The plaintiffs' primary contention is that the defendants defrauded them into contributing additional capital to Verdesian to partially fund the acquisition by making false statements and omitting material information about SFP's sales programs implemented prior to the transaction. These programs allegedly had a negative impact on SFP's sales going forward. The plaintiffs contend that disclosures about these programs would have revealed that SFP was a poor investment, and they would not have contributed additional capital to facilitate the acquisition. So, according to the plaintiffs, the defendants intentionally misrepresented or concealed the programs in order to hide a key driver of SFP's declining financial condition.

At bottom, the plaintiffs assert that the defendants intentionally or recklessly pursued a bad deal and misrepresented information uncovered in diligence to induce investors (including the plaintiffs) to support the deal. The evidentiary record

1

developed over a five-day trial did not prove up that theory, which defies logic and common sense. Among other problems, the plaintiffs' theory rests on the notion that the defendants took action contrary to their own economic interests by personally investing in a transaction they knew would fail. It cannot account for the significant diligence efforts the defendants undertook prior to the transaction. And it ignores that the defendants disclosed the sales programs to Verdesian's lenders and institutional investors, who provided most of the financing in the capital raise, which was two times oversubscribed.

"[A]ll truth, in the long run, is only common sense clarified."[1] The extensive trial record confirmed that the defendants had no reason to commit fraud and did not intentionally misrepresent or withhold information about SFP's sales programs to the plaintiffs, nor act in bad faith in breach of Verdesian's operating agreement.

Accordingly, for the reasons explained below, judgment is entered for the defendants.

---

[1] Thomas Henry Huxley, *American Addresses, with a Lecture on the Study of Biology* 90 (Jefferson Publication).

## I. BACKGROUND

The following facts are as the Court finds them following a five-day trial held from September 15 through September 19, 2025.[2]

### A. Paine Forms Verdesian To Acquire Agricultural Companies.

Defendant Paine is a Delaware limited liability company headquartered in San Mateo, California, that operates as a private equity firm, identifying and managing investments in portfolio companies.[3] Paine's investments focus on the global food and agribusiness sector, including sustainable food chain investing.[4]

In 2012, Paine formed Verdesian, a Delaware limited liability company, to "develop[], licens[e], manufactur[e], market[], and distribut[e] fertilizers, pesticides, and related agricultural products" by "assembl[ing] a portfolio of proprietary but underexploited specialty plant technologies" through acquisitions.[5] Verdesian was governed by an operating agreement (the "Operating Agreement") that vested a board of managers (the "Board of Managers") with authority to manage Verdesian.[6]

---

[2] The Joint Submission of Pretrial Order is cited as "PTO ¶ __". Trial testimony is cited as "Tr. (Witness) at __". Dkts. 233–37. Joint exhibits are cited as "JX __" unless otherwise defined. Dkt. 230.

[3] PTO ¶ 48; *see* Tr. (Browne) at 704:14–705:6; *id.* (Schwartz) at 615:8–16; *see also* Defs.' Post-Trial Br. [hereinafter DB] at 8, Dkt. 249 ("Defendant Paine is Verdesian's former private equity sponsor.").

[4] Tr. (Browne) at 706:18–707:13.

[5] PTO ¶¶ 49, 53.

[6] JX 229 at 39 (Section 6).

3

Between 2013 and 2016, Verdesian's Board of Managers included Kevin Schwartz, the President, Chief Executive Officer ("CEO"), and founding partner of Paine; David Browne, a member of Paine's board of directors from 2011 to 2017; Jeffrey ("JJ") Grow, Verdesian's CEO until 2016, and thereafter, its Chairman; and David Buckeridge, Angelos Dassios, Alexander Corbacho, and Robert Berendes (together with Paine, "Defendants").[7] Paine designated a majority of the members of the Board of Managers and, with its affiliates, owned a majority of Verdesian's Class A Units.[8]

### B. Plaintiffs Sell Their Companies To, And Invest In, Verdesian.

Verdesian's strategy was to acquire and integrate smaller agriculture businesses into "a scaled multi-product, multi-geography, multi-crop plant nutrition business" to position itself as an attractive acquisition target.[9] To execute on that strategy, Verdesian acquired six companies between 2012 and 2014.

Among those acquisitions, in February 2013, Verdesian acquired Northwest Agricultural Products, LLC ("NAP"), a company founded by plaintiff David

---

[7] PTO ¶¶ 42–47, 52. Nonparty Adam Fless and Kenneth Avery were also members of the Board of Managers when the action was filed, but claims against them have been dismissed. *See MKE Hldgs. Ltd. v. Schwartz* (*MKE II*), 2020 WL 467937, at *15 (Del. Ch. Jan. 29, 2020) ("[T]he claims against Avery and Fless are dismissed.").

[8] PTO ¶ 50; JX 229 at 39 (Section 6.2(a)).

[9] JX 598 (Schwartz) at 30:13–19.

Bergevin, for $34 million.[10]  Among other products, NAP manufactured Sterics, which enhance the absorption of phosphorus in crops.[11]  Bergevin reinvested $7 million of the NAP sale proceeds in exchange for 278,441 Verdesian Class A Units and observer rights on the Board of Managers.[12]  Bergevin acted as a consultant for Verdesian for two years after the transaction.[13]

Verdesian later acquired INTX Microbials, LLC ("INTX"), a company founded by plaintiff MKE Holdings, LTD ("MKE," and with Bergevin, "Plaintiffs") in a two-part transaction for a total of $32 million.[14] INTX sold biological inoculants that converted nitrogen into a usable form for legumes.[15]  MKE reinvested a total of $5 million of the sale proceeds in exchange for 198,887 Class A Units and observer rights on the Board of Managers.[16]  After the transaction, MKE's principal, Michael Blanding, served as Verdesian's Vice President of Business Development for Seed Treatment and Inoculants from 2013 through 2016.[17]

---

[10] PTO ¶¶ 53, 55.

[11] Tr. (Bergevin) at 228:3–5, 229:7–14.

[12] PTO ¶ 55.

[13] *Id.*

[14] *Id.* ¶¶ 56–57.

[15] Tr. (Blanding) at 13:3–14.

[16] PTO ¶ 57; Tr. (Blanding) at 109:4–7, 109:12–20.

[17] PTO ¶ 57; Tr. (Blanding) at 105:12–19.

## C. Verdesian Considers SFP As An Acquisition Target And First Learns Of SFP's Bulk And Early Fill Programs.

In October 2013, Larry Steinbrueck, a banker at investment firm Midwest Capital Group, contacted Grow to pitch a transaction between Verdesian and SFP, a plant nutrition science company that produced fertilizer enhancements to improve crop yields.[18]

Grow presented the opportunity to Paine.[19] At the outset, SFP seemed to make an attractive target for Verdesian. SFP was focused primarily on customers that grew corn in the Midwest, a large market that Verdesian had not yet entered,[20] presenting possible opportunities to cross-market products.[21] SFP offered a large portfolio of patents that did not duplicate Verdesian's existing patents.[22] An acquisition of SFP could capture synergies by reducing sales and back-office staff.[23] Additionally, SFP was larger than Verdesian's other portfolio companies

---

[18] JX 49 at 1; JX 58 at 10.

[19] JX 49 at 1.

[20] Tr. (Browne) at 714:15–23; *id.* (Grow) at 1057:3–13.

[21] *See* JX 225 at 58, 75–77.

[22] *Id.* at 4; Tr. (Browne) at 714:13–715:10; *id.* (Grow) at 1056:11–21.

[23] Tr. (Browne) at 715:11–20; *id.* (Grow) at 1057:14–19.

combined,[24] such that an acquisition of SFP could raise Verdesian's EBITDA to above $40 million, a key milestone for a future sale.[25]

Over the following weeks, Steinbrueck shared preliminary financial information for SFP, including its balance sheet as of November 2013.[26]

In the second half of 2013, SFP began to run programs (the "Bulk and Early Fill Programs") through which it offered customers a discount on fertilizer treatment products purchased in large quantities before the spring planting season began.[27] Steinbrueck explained that SFP's "management ha[d] been working on [the Bulk and Early Fill Programs] for a year or two and they [we]re very pleased with the results."[28]

However, as would later become apparent, the Bulk and Early Fill Programs had the effect of shifting some portion of SFP's sales from the spring of 2014 (SFP's historical peak selling period) to the fall of 2013.[29] Steinbrueck noted that, as a result of the programs, "somewhere around $9,000,000 w[ould] be transferred from 'other

---

[24] JX 49; Tr. (Browne) at 715:4–10.

[25] *See* JX 76 at 1; Tr. (Browne) at 715:4–10; *id.* (Grow) at 1058:6–19.

[26] JX 67 at 3.

[27] JX 223 at 11.

[28] JX 67 at 1.

[29] JX 223 at 11.

liabilities' to the accounts receivable line" on SFP's balance sheet to account for the Bulk and Early Fill Programs.[30]

**D.    Paine Pitches A Transaction With SFP To Its Investment Committee.**

Browne was designated to lead Paine's deal team on the SFP opportunity,[31] and in December 2013, he worked with a team of Paine employees to prepare a presentation[32] for Paine's investment committee, pitching a transaction in which Verdesian would acquire SFP (the "SFP Transaction").[33] The presentation indicated that SFP was growing fast and profitably, with a multi-year high compound annual growth rate ("CAGR") for total sales around 36% and gross margins in excess of 80%.[34] The presentation concluded that SFP's strong financials and Paine's thesis of long-term growth for agricultural technology made SFP a "[b]ull's-eye in fit" for Verdesian.[35] The presentation also touted SFP as a "multiple kicker," meaning

---

[30] JX 67 at 1.

[31] Tr. (Schwartz) at 632:22–633:4; *see also* JX 72 at 1.

[32] Tr. (Browne) at 820:6–16 ("Q. Were you involved in preparing that presentation? A. Yes."); *see id.* (Schwartz) at 627:21–628:1; *see also* JX 73 at 4 ("Deal team believes SFP would be an important and complementary addition to Verdesian."); JX 76 at 1.

[33] JX 73 at 1.

[34] *Id.* at 12; Tr. (Browne) at 717:5–17.

[35] JX 73 at 4.

SFP's large size could result in a future buyer paying a higher EBITDA multiple to acquire Verdesian as a whole.[36]

### E. Verdesian Submits An Offer To Acquire SFP And Begins Diligence In Earnest.

Paine's investment committee approved the SFP Transaction, and on December 23, 2013, Verdesian submitted an initial letter proposing to acquire SFP for $285 million.[37] Another private equity firm pursued SFP at the same time, and SFP rejected Verdesian's initial proposal.[38] Verdesian increased its proposal to $300 million,[39] which SFP also rejected. In early February 2014, representatives of SFP and Verdesian met in Kansas City to continue negotiations.[40] At the same time, Verdesian's Chief Operating Officer, Greg Thompson, met with representatives of United Suppliers, one of SFP's largest customers.[41]

While meeting in Kansas City, Verdesian representatives learned that the competing firm had submitted a higher bid to acquire SFP.[42] Verdesian raised its

---

[36] JX 76 at 1.

[37] JX 77 at 3; JX 88 at 1, 64–6; *see* Tr. (Browne) at 716:2–9, 718:4–7.

[38] JX 97 at 2; Tr. (Schwartz) at 629:6–10; *id.* (Grow) at 1059:20–24.

[39] JX 108 at 1; Tr. (Browne) at 719:9–10.

[40] JX 108 at 3; Tr. (Browne) at 719:12–720:5; *id.* (Grow) at 1060:12–18.

[41] JX 117; JX 225 at 61; JX 305 at 3.

[42] *See* JX 125 at 3; *see also* Tr. (Clarke) at 580:16–20.

9

offer to $313.5 million, which SFP accepted.[43]  Verdesian and SFP then executed a non-binding term sheet for the SFP Transaction that contemplated a purchase price of $313.5 million and a period for confirmatory due diligence.[44]

Verdesian engaged advisors from KPMG; Dean & Company ("Dean"); Benesch, Friedlander, Coplan & Arnoff LLP; and Potter Anderson & Corroon LLP to assist with diligence.[45]  In mid-February, Verdesian, Paine, and SFP held an all-hands kickoff meeting to review a diligence plan, which Blanding attended.[46]

### F.    Verdesian Raises Capital To Fund The SFP Transaction.

To fund the SFP Transaction, Verdesian raised capital through a combination of debt and equity investments.[47]  Also in mid-February, Paine and Verdesian began contacting potential investors.[48]

On February 28, Paine and Verdesian sent potential co-investors a 52-page "teaser" presentation summarizing the SFP Transaction based on a preliminary analysis (the "Co-Invest Presentation").[49]  The Co-Invest Presentation described

---

[43] PTO ¶¶ 61, 67.

[44] JX 123 at 1; JX 125 at 3.

[45] PTO ¶¶ 27, 63.

[46] *Id.* ¶ 62; JX 133 at 1.

[47] JX 283 at 3; Tr. (Browne) at 722:12–20.

[48] JX 448 at 3.

[49] JX 146 at 1; Tr. (Browne) at 881:16–18.

10

Verdesian's diligence process and made a preliminary case for the SFP Transaction, highlighting positive "[SFP] Management-projected 2014 revenue and EBITDA," patented technology, and "cross-selling potential."[50] When describing the diligence workstreams, the Co-Invest Presentation highlighted that "KPMG [was] performing [a] quality of earnings analysis on [the] combined company."[51] Paine tracked potential co-investors' interest in a spreadsheet that identified the diligence materials each potential investor received.[52]

### G. Paine And Verdesian Investigate The Bulk And Early Fill Programs In Diligence.

Paine tasked KPMG in diligence with analyzing SFP's financials and preparing a quality of earnings ("QOE") analysis.[53] KPMG's goal in preparing the QOE analysis was to estimate a "true," or normalized, level of SFP's recurring earnings by making positive and negative adjustments to account for one-time unusual items, out of period expenses, and abnormal accounting treatment.[54] Angela

---

[50] JX 146 at 4; *see also* JX 225 at 4 (attaching the Co-Invest Presentation).

[51] JX 146 at 12; *see also* JX 225 at 12 (attaching the Co-Invest Presentation).

[52] *See generally* JX 448. In late February, the Board of Managers discussed the SFP Transaction at a meeting in San Antonio, Texas, which Blanding attended. *See* JX 133 at 1–2; Tr. (Grow) at 1060:23–1061:3, 1063:6–9.

[53] *See* JX 240 at 25.

[54] *Id.*; Tr. (Muse) at 670:6–11; *see id.* (Browne) at 723:19–24 ("[W]e always did an accounting, quality of earnings diligence."); *id.* at 735:10–18.

Muse, a project manager at KPMG, spearheaded KPMG's diligence efforts, reporting to Grow and Browne.[55]

On March 6, Muse sent SFP a list of open diligence requests that included "estimate[s] of sales and margin impact by customer/product for sales booked in Aug-Dec-13 due to new bulk/early fill program[.]"[56] The same day, Muse updated Browne on KPMG's analysis.[57] Her update included additional information on the Bulk and Early Fill Programs, which, according to Muse, had "over-stated" fiscal year 2013 sales figures by "shift[ing] sales from early FY14 to end of FY13."[58] Browne asked for a call to better understand the sales figures for 2013 and 2014.[59]

On March 18, Muse provided Browne another update on the status of KPMG's analysis. Her report noted that SFP's recent sales "were light in YTD Feb-14 but management indicated the first two weeks of March 2014 ha[ve] rebounded."[60] When Browne asked for clarification, Muse explained that as of February 14, 2014, SFP's year-to-date earnings had declined 40% compared to

---

[55] JX 141 at 1; *see* JX 197 at 1; Tr. (Muse) at 677:13–16; *id.* (Browne) at 734:9–15; *id.* (Grow) at 1167:4–8.

[56] JX 149 at 2, 6.

[57] JX 151 at 1.

[58] *Id.*

[59] *Id.*

[60] JX 172 at 3.

12

February 2013, which SFP's management attributed to "weather."[61] This theory was supported by later evidence that the "corn belt"[62] had experienced the "sixth coldest winter on record."[63] Browne acknowledged there could be "issues if Q1 is off 40%" but asked for "March data," since historically "March [wa]s a big month for" SFP.[64]

The next day, Verdesian asked SFP for additional information about its sales figures. SFP responded with additional details about the Bulk and Early Fill Programs, explaining the programs were a permanent transition that "provide[d] greater potential for continuing growth" and would "result in similar increases to 2014 sales numbers" in the coming fall to balance out the spring decline.[65] Browne and Grow believed weather also was likely a factor, as Verdesian's other portfolio companies had seen similar weather-induced sales lags.[66]

On March 20, Muse sent Browne an email summarizing her calls with SFP, reiterating that since the Bulk and Early Fill Programs were introduced, SFP had

---

[61] *Id.* at 1–2

[62] JX 264 at 1.

[63] JX 315 at 24; JX 335 at 53; *see* JX 201 at 33; JX 204 at 40; JX 249; JX 261 at 3; JX 264 at 4–13; JX 271; JX 284; JX 294; JX 296; JX 297 at 1, 4; JX 315; JX 392; JX 412 at 4.

[64] JX 172 at 1.

[65] JX 173 at 5.

[66] JX 179 at 1. U.S. Department of Agriculture reports from the time confirm that in early 2014, most of the Midwest "corn belt" experienced an unusually cold winter, putting corn plantings behind. JX 264 at 1; *see* JX 249; JX 271; JX 315 at 24.

"made a fundamental shift from a sales cycle that peaked in Q1 to a sales cycle that peaks in Q1 AND Q3."[67] Muse noted that because the shift began in the prior year, "FY13 may have captured the impact of two sales cycles . . . and thus [FY 13 was] overstated."[68]

The same day, Steinbrueck separately emailed Browne about the Bulk and Early Fill Programs, noting that SFP was making minor adjustments to its financials as a result of the programs.[69] Browne responded that the programs were "not an issue for us."[70]

On March 27, Grow spoke again with United Suppliers about SFP.[71] As recounted by Grow, United Suppliers expressed enthusiasm about SFP but cautioned that SFP's program marketing "[wa]s a little over done."[72] Grow believed that United Suppliers nevertheless viewed the Bulk and Early Fill Programs as a success that provided a competitive advantage, conveying to Browne that United Suppliers told him some sales had shifted from spring into fall as a result of the programs, but

---

[67] JX 184 at 1.

[68] *Id.*

[69] JX 183 at 1.

[70] *Id.*

[71] JX 195 at 1.

[72] *Id.*

ultimately the programs would not "slow the YOY growth rate."[73]   With this additional insight, Browne directed Dean to note in its ongoing commercial diligence report that United Suppliers believed SFP was capable of growing "20%+" per year, and that concerns over the Bulk and Early Fill Programs were largely a "timing issue[.]"[74]

## H.     KPMG Delivers A Draft Of Its Quality Of Earnings Report.

On March 27, KPMG provided Browne and Grow with an initial draft of its QOE analysis (the "Draft QOE Report"), accompanied by draft workbooks supporting the analysis.[75]   The Draft QOE Report calculated SFP's adjusted EBITDA for fiscal years 2012 and 2013 as $26.6 million, which KPMG further adjusted to $29.3 million.[76]   To reach that $2.7 million net adjustment, the Draft QOE Report made a negative $3.38 million adjustment to account for the Bulk and Early Fill Programs, offset by other positive adjustments for advertising and compensation expenses after closing.[77]

The Draft QOE Report stated that while "[SFP's] [m]anagement anticipates somewhat of a two peak sales cycle going forward[,]" KPMG had "no evidence of

---

[73] *Id.*; JX 226 at 1.

[74] JX 195 at 1.

[75] JX 197 at 1.

[76] *Id.* at 3.

[77] *Id.* at 1, 3.

15

that as YTD Mar-14E sales are 18% lower than YTD Mar-13 sales."[78] The Draft QOE Report acknowledged that a portion of SFP's sales decline "may be weather-related," but further stated that "it is clear [SFP] has not yet captured . . . replacement sales as intended."[79]

Browne viewed the Draft QOE Report as a "good result" and shared it with Kevin Schwartz, Paine's CEO and one of Verdesian's Managers.[80]

## I.     Dean Delivers Its Commercial Due Diligence Report.

On March 28, Dean issued a comprehensive commercial due diligence report (the "Dean Report").[81] Browne viewed the Dean Report—which was based on interviews with customers, certified crop advisors, and academics; discussions with Verdesian and SFP management; and other company and industry data[82]—as "overwhelmingly favorable."[83] The Dean Report calculated an 18% CAGR for SFP's net revenue, touting expected synergies like complementary capabilities and

---

[78] *Id.* at 19.

[79] *Id.*

[80] JX 193.

[81] JX 225 at 54.

[82] *Id.* at 55.

[83] Tr. (Browne) at 767:20–768:4 ("I mentioned that the Dean [R]eport on the market sizing produced . . . 23% CAGR . . . very rare to have a third party come in and believe that the management sales case was actually conservative."); *id.* (Grow) at 1065:5–8.

16

the opportunity for cross-selling between customer bases.[84] The Dean Report identified the Bulk and Early Fill Programs but did not raise them as a "concern."[85] Paine and Verdesian provided a copy of the Dean Report to potential investors, including Blanding.[86]

### J. KPMG Finalizes The QOE Report.

On April 1, Browne informed Muse that SFP's March sales had finished "stronger than [KPMG] had estimated" and SFP was "bullish on April" as well.[87] As a result, Browne asked Muse to update the Draft QOE Report to note "that the bulk fill adjustment will roll off certainly after April in any LTM calculation."[88] Muse responded that she was "comfortable noting that."[89]

Paine used the Draft QOE Report and the Dean Report to develop a five-year financial model ("Paine's Financial Model") for SFP, Verdesian, and the combined

---

[84] JX 225 at 58; *id.* at 238 (showing 18.2% CAGR for SFP's net revenue from 2013 through 2018).

[85] *Id.* at 136.

[86] *Id.* at 1; JX 448. In post-trial briefing, Plaintiffs claim they relied on the Dean Report when deciding to invest. Pls. MKE Hldgs. Ltd. and David W. Bergevin's Opening Post-Trial Br. [hereinafter POB] at 70, Dkt. 246 ("The information Plaintiffs relied on—the Dean Report, co-investor deck and the [Ratings Agency Presentation] . . . .").

[87] JX 206 at 1.

[88] *Id.*

[89] *Id.*

entity[90] under two operating scenarios: a "Base Case" that projected 15% top-line growth for the post-acquisition combined entity, and a more aggressive "Dean Case" that projected 24% top-line growth after the acqusition.[91] Paine's Financial Model applied EBITDA adjustments that were similar but not identical to adjustments made in the Draft QOE Report, including a negative $3.38 million EBITDA adjustment, a positive $1.38 million adjustment, and another negative $750,000 EBITDA adjustment.[92]

On April 10, Browne sent Blanding the Dean Report, the Co-Invest Presentation (noting that the "numbers here are a little stale"), and Paine's Financial Model.[93] Later that day, KPMG sent an updated Draft QOE Report to Browne and Grow.[94] Browne forwarded KPMG's April 10, updated Draft QOE Report to Goldman Sachs.[95]

---

[90] JX 225 (native).

[91] *Id.* at Tab "Financial Model," Cell S47. For SFP on a standalone basis, the "Base Case" projected 10% top-line growth and the "Dean Case" projected 18% growth. *Id.* at Tab "SFP," Cell O38.

[92] *Id.* at Tab "SFP," Cell H93 (showing a negative $2.8 million adjustment broken down as follows: "**=-3.38+1.38-0.75**") (emphasis added).

[93] PTO ¶ 66; JX 225 at 1.

[94] PTO ¶ 64; JX 228; Tr. (Browne) at 734:16–19.

[95] JX 224 at 1.

On April 11, Muse told the KPMG team that "in general [Verdesian] [was] good with the [QOE] report" but "want[ed] [KPMG] to revisit language in a few areas to soften it[.]"[96] For example, Browne asked KPMG to clarify that "[w]hile first quarter [was] off 15%, underperformance was entirely in Jan and Feb with March up [25]% over prior year, which would be consistent with weather."[97]

That evening, Muse sent Browne and Grow the final QOE report (the "QOE Report") reflecting the "edits discussed for the bulk/early fill programs and the twin peaks."[98] The QOE Report added language stating that "the impact of [the Bulk and Early Fill Programs EBITDA adjustment] . . . is temporary in nature and will most likely roll off after [April 2014],"[99] and also added that "the President of United Suppliers, Brad [Oelmann], . . . expects purchases from United Suppliers to grow 20%."[100] The final QOE Report also acknowledged the "risk that FY 13 includes a

---

[96] JX 243 at 1.

[97] JX 245; Tr. (Browne) at 758:21–759:3 ("[A]s I processed the report and KPMG's findings, I thought this was useful context to my understanding. I thought it would be useful to any reader or user of the report."); *id.* (Grow) at 1105:16–23 ("Q. [I]n your experience, how common or uncommon was it to provide comments to KPMG with respect to their work? A. It was always very common, because there were things that happened in the market that KPMG is not aware of.").

[98] JX 240 at 1. Muse sent a "final . . . report" on April 25, but there are no material differences between that report and the QOE Report sent on the evening of April 11. JX 281 at 1.

[99] JX 240 at 30.

[100] *Id.*

19

one-time benefit" from "this fundamental business shift from a sales cycle that historically peaked in Q1 to a sales cycle that peaks in both Q1 and Q3."[101] Overall, the EBITDA adjustments reflected in the QOE Report calculations remained positive,[102] despite KPMG modifying its *pro forma* EBITDA adjustment for the Bulk and Early Fill Programs from negative $3.38 million to negative $3.5 million.[103]

On April 11, Paine sent the QOE Report to lenders and co-investors.[104] By April 25, Goldman Sachs agreed to underwrite $225 million in debt financing for the deal, outside investors had committed to invest $122 million in equity,[105] and the equity raise was two times oversubscribed.[106]

On April 28, Paine's investment committee received materials summarizing the results of the due diligence process, which described diligence as "favorable" and concluded that the SFP Transaction presented a "[v]ery attractive return profile."[107]

---

[101] *Id.* at 11.

[102] *Id.* at 10.

[103] *Id.*

[104] PTO ¶ 64.

[105] JX 283 at 3.

[106] *Id.*

[107] *Id.* at 2, 4.

## K.     Verdesian Executes A Purchase Agreement To Acquire SFP.

On May 2, 2014, Verdesian and SFP entered into an agreement (the "Purchase Agreement") for Verdesian to acquire SFP for $313.5 million.[108]

On May 15, the Board of Managers held a regular, quarterly meeting.[109]  In advance of the meeting, members of the Board of Managers and board observers (including Plaintiffs) received a meeting agenda, minutes from a February meeting, and a board packet with slides on the topics to be discussed at the meeting.[110] Blanding attended this meeting,[111] during which Grow presented details of the SFP Transaction, including discussion of the Bulk and Early Fill Programs.[112]

Around the same time, Goldman Sachs prepared a presentation for the ratings agencies to secure a debt rating for the acquisition loan (the "Ratings Agency Presentation").[113]  The Ratings Agency Presentation included a slide, drafted by Browne,[114] stating that SFP's sales decline in early 2014 was "driven in part by

---

[108] PTO ¶ 67.

[109] *Id.* ¶¶ 68, 75.

[110] JX 306 at 1.

[111] *Id.* at 2.  A meeting agenda listed Bergevin as attending "by phone."  *Id.*

[112] JX 274 at 1; JX 299 at 4 (photo showing Blanding at the meeting); JX 306 at 2; Tr. (Grow) at 1107:2–9; *but see id.* (Blanding) at 127:3–9 ("Q. [D]id you attend this meeting . . . ?  A. I don't know.").

[113] JX 335 at 5; Tr. (Browne) at 794:9–17.

[114] JX 318.

transition . . . from spring planting season to autumn as part of an Early Fill program[,]" but that Verdesian "[e]xpect[ed] [a] meaningful uptick in summer and fall months."[115]  The slide also stated that SFP's sales were "impacted by weather," including the "[s]ixth coldest winter . . . over [the] last 120 years."[116]

### L.    Plaintiffs Exercise Their Preemptive Rights To Participate In The Equity Raise While SFP Sales Decline.

On June 1, Browne emailed Verdesian's Members, including Plaintiffs, a notice of preemptive rights (the "Notice"), notifying them of their right under the Operating Agreement to participate in the equity raise in connection with the SFP Transaction.[117]  The Notice stated that, "given the magnitude of the equity being raised," Verdesian "[did] not expect many members to have the liquidity or desire to exercise pre-emptive rights at anything approaching the maximum allowable level[,]"[118] but further explained that "the board is only approving this acquisition because we believe that it will be accretive in terms of value per unit, creating value for all members."[119]  Browne's email attached a copy of the Ratings Agency

---

[115] JX 335 at 53.

[116] *Id.*

[117] *Id.* at 2, 4; JX 229 at 56 (Section 8.10).

[118] JX 335 at 1.

[119] *Id.*

22

Presentation, a notice of preemptive rights, and a capitalization table.[120]  His email

did not attach the QOE Report.[121]

On June 3, Bergevin exercised his preemptive rights and committed to invest

an additional $8.1 million into Verdesian.[122]  On June 10, Blanding exercised his

preemptive rights and invested an additional $3 million into Verdesian.[123]

SFP's sales growth flattened in 2014 compared to the prior year.  On June 4,

SFP delivered updated sales results showing $56,589,163 in sales through May 2014

compared to $54,059,372 through May 2013.[124]

On June 9, Thompson emailed Grow, expressing skepticism that May sales

results would reflect 20% growth.[125]  Grow asked Thompson to call United

Suppliers,[126] and on June 18, United Suppliers[127] told Thompson that it had

"inventory [that] was higher than expected at that point in time" due to worsening

---

[120] *Id.*

[121] *Id.*; Tr. (Browne) at 906:22–907:5 ("Q. But in sending this, you did not include the [QOE] report; is that correct?  A. That's correct.  Q. And there's no question you had the final [QOE] report by this time?  A. No, I did.").

[122] JX 410 at 3.

[123] JX 356; Tr. (Blanding) at 184:14–17.

[124] JX 354 at 3 (showing declines in sales on a monthly basis).

[125] *Id.* at 1.

[126] JX 379 at 2.

[127] JX 378 (Thompson's notes to himself after calling United Suppliers); Tr. (Thompson) at 267:16–22.

market conditions, but United Suppliers "reinforced [its] commitment to selling [SFP] products and to moving forward."[128] Thompson later told Grow that he would not "like what [United Suppliers] told [him]."[129] Yet weeks later, United Suppliers continued to express enthusiasm about growing SFP "to the next level."[130]

On June 20, Bergevin's cousin and financial advisor, Chris Huether, emailed Browne to inform him that Bergevin was decreasing his investment from $8.1 million to $4.1 million.[131] Because the equity raise was oversubscribed, closing was not impacted,[132] and Browne reassured Huether that, "[i]n truth, the math actually worked better with the lower funding[.]"[133]

### M. The SFP Transaction Closes.

The SFP Transaction closed on July 1, 2014.[134] The transaction was funded with $200 million in debt and $154.8 million in equity, including $45.4 million from

---

[128] Tr. (Thompson) at 268:5–12.

[129] JX 379 at 1.

[130] JX 398 at 2.

[131] JX 382 at 1.

[132] JX 394 at 1.

[133] *Id.*; *see also* Tr. (Browne) at 786:21–787:14 ("Q. [A]ll else being equal, would you have preferred that the preemptive rights holders exercised their rights or not exercised their rights? A. We would have preferred that they not . . . . [W]e would rather give . . . [an] allocation to those [institutional] investors versus the preemptive rights holders who everything that they took up would be coming dollar for dollar out of these other clients of the firm.").

[134] PTO ¶ 71.

Paine, $98.8 million from co-investors, and $10.6 million from preemptive rights holders.[135]

Paine received a $6 million transaction fee from Verdesian in connection with the SFP Transaction.[136] Grow received a transaction bonus, which he elected to roll into new Verdesian Class M units.[137] Other Verdesian executives similarly rolled over substantial portions of their transaction bonuses into Class M units.[138]

The SFP Transaction increased Verdesian's adjusted EBITDA to $45.2 million in 2014, up from $14.5 million the prior year.[139] In 2014 and 2015, Paine received management service fees of $1,145,053 and $1,205,798, respectively,[140] up from service fees of less than $200,000 in prior years.[141]

## N.     SFP's Sales Continue To Decline After Closing.

SFP's sales declined after closing. On July 24, new results showed SFP's sales were down 17% through July compared to the prior year, with inventory

---

[135] JX 390 at 3.

[136] PTO ¶ 73.

[137] JX 357 at 3; JX 390 at 3 (showing Grow received 52,600 M-1 Units, 22,650 M-2 Units, and 13,267 M-3 Units); Tr. (Grow) at 1123:15–21.

[138] JX 353 at 1; JX 390 at 3.

[139] PTO ¶ 72.

[140] *Id.* ¶ 73.

[141] *Id.*

surplus at retailers as one of the causes.[142]  In response to this news, Grow told SFP's

former CEO, Larry Sanders,[143] that he hoped "we are done with the surprises."[144]

In August, Verdesian held an "Executive Team Meeting" with Blanding in

attendance.[145]  Meeting participants received materials identifying "initial high level

thoughts" on the SFP Transaction, including a discussion of "[s]ales (understanding

the games that have been played in the past)."[146]  Verdesian's Vice President of

Operations, Michael King, later circulated additional materials identifying the

"Pretreat to Retreat," "Bulk Program," and "Early Fill Tote Program" as programs

requiring "[r]eview . . . for validity" in the sales planning process.[147]

---

[142] JX 417 at 2, 4.

[143] JX 73 at 3 ("[SFP was] [f]ounded in 1998 by Larry Sanders, President & CEO (35% owner)[.]").

[144] JX 417.

[145] JX 429 at 1.  Blanding did not specifically recall which Board of Manager meetings or Executive Team Meetings he attended, but acknowledged that the documentary record reflects his attendance at an Executive Team Meeting soon after the closing of the SFP Transaction. *See, e.g.*, Tr. (Blanding) at 121:10–18 ("I don't remember this, [to] be honest with you.  I remember the board meeting.  I remember Commodity Classic.  I do not remember the executive team meeting."); *id.* at 190:1–6 ("Q. And so you were in—a month after this deal closes, you are in an executive management meeting with other senior executives of Verdesian talking about the bulk and early fill programs.  Right?  A. It looks like it.").

[146] JX 429 at 4–5.

[147] JX 430 at 1, 15.

The same month, the Board of Managers held a quarterly meeting, which Blanding attended.[148] In connection with the meeting, members and observers of the Board of Managers received a presentation with slides identifying "[c]oncerns" from the first thirty days following the SFP Transaction, including increased competition, lack of product certification, customer consolidation, the "2013 'load program,'" and "[h]igh retail inventory levels."[149] The August board materials, which both Plaintiffs received, contained an update on SFP's sales performance, reporting a $6.8 million decline in sales compared to the prior year and a forecasted 8% decline in SFP's 2014 sales overall.[150]

In October, Verdesian's Board of Managers held another quarterly meeting, at which participants received materials identifying issues with sales at SFP, including "4.1M loaded in 4th quarter of 2013 at the direction of [SFP's former CEO]" and customers with "high inventories . . . at the retail level."[151] In December, the Board of Managers received materials indicating that SFP's sales through

<hr>

[148] JX 433 at 1; Tr. (Blanding) at 168:22–169:7.

[149] JX 433 at 29; Tr. (Grow) at 1135:4–10, 1140:18–22, 1141:16–21, 1142:5–10, 1143:10–14.

[150] JX 433 at 19, 29.

[151] JX 451 at 4–5.

November 2014 had declined by more than $10 million compared to the prior year.[152]

## O.    Lower Commodity Prices Contribute To An Industry-Wide Decline.

At the end of 2016, and with the benefit of hindsight, Paine prepared a year-end report for investors in "Fund III," the fund through which Paine held its Verdesian investment, reporting that commodity and corn prices had fallen, reducing net farming income nationwide and impacting plant nutrition companies like Verdesian.[153]

No single cause was responsible for Verdesian's underperformance. Reduced profits from low prices caused unexpected reluctance to invest in fertilizers and products designed to improve fertilizer efficiency.[154]  While Verdesian and Paine believed the business would be resistant to a low commodity price environment because farmers would still be better off using Verdesian's products given their ability to increase crop yield, they later learned that this thesis failed to account for

---

[152] JX 538 at 10, 14, 17.

[153] *See* JX 528 at 260–61; *see also* JX 545 at 146 (reflecting Verdesian's view that 2015 was a challenging year for the agricultural industry partly due to "sharply lower farm income," and explaining that "[t]he further upstream and the more novel [the product], the greater the decline has been as ag. distributors and retailers de-stocked and farmers re-trenched to the basics").

[154] JX 545 at 146; Tr. (Browne) at 806:8–807:11.

the real-world difficulty of persuading farmers who felt "poor" to invest in specialty products.[155] SFP also encountered more competition than anticipated and was not able to deliver as well as expected on its cross-selling initiative, and faced unexpected challenges obtaining accreditation, which some states adopted to regulate fertilizer, partly due to a campaign mounted by competitors.[156]

### P. AEA Investors LP Acquires Verdesian.

In May 2015, Verdesian engaged KPMG to analyze its performance as Verdesian "consider[ed] alternatives in connection with a potential sale . . . ."[157] Nearly six years later, in February 2021, AEA Investors LP acquired Verdesian for $16.37 per unit.[158]

### Q. MKE Makes A Demand To Inspect Verdesian's Books And Records.

In October 2017, MKE made a demand to inspect Verdesian's books and records.[159] In response, Verdesian made two document productions, the second of

---

[155] Tr. (Browne) at 806:22–807:11.

[156] *Id.* at 807:14–808:6.

[157] JX 496 at 4.

[158] JX 596 at 14–15.

[159] PTO ¶ 76.

29

which included the QOE Report.[160]  Thereafter, Blanding encouraged Bergevin to join him in filing this lawsuit.[161]

### R.  Verdesian's Operating Agreement

Section 6.9 of Verdesian's Operating Agreement waives fiduciary duties of the company's Managers:

> (a)  To the extent that, at law or in equity, a Manager or Member (in such capacity, including any Affiliate of any Person acting in such capacity) has duties, including fiduciary duties, and liabilities relating thereto to the Company or to any other Person, such Person acting under this Agreement shall not be liable to the Company or to any other Person for its good faith reliance on the provisions of this Agreement or any approval or authorization granted by the Company or any other Person.

> (b)  Notwithstanding anything contained in this Agreement to the contrary, to the fullest extent permitted under the LLC Law, the Members hereby waive any fiduciary duty of the Managers, so long as such Person acts in a manner consistent with this Agreement.[162]

Section 6.4(b) of the Operating Agreement nevertheless requires that Managers must perform their duties in good faith:

> Subject to Section 6.4(e) hereof, a Manager shall perform his duties as a manager in good faith, in a manner he reasonably believes to be in or not opposed to the best interests of the Company, and with the care that an ordinarily prudent person in a similar position would use under similar circumstances.[163]

---

[160] *Id.* ¶ 78.

[161] Tr. (Bergevin) at 365:10–366:10.

[162] JX 229 at 46 (Section 6.9).

[163] *Id.* at 42 (Section 6.4(b)).

Section 6.4(e) further states:

>   Notwithstanding any other provision of this Agreement or applicable law, whenever in this Agreement a Manager or Member is permitted or required to make a decision (i) in its, his or her discretion or under a grant of similar authority, such Manager or Member shall be entitled to consider only such interests and factors as such Manager or Member desires, including its, his or her own interests, and shall, to the fullest extent permitted by applicable law, have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person, or (ii) in its, his or her good faith or under another express standard, such Manager or Member shall act under such express standard and shall not be subject to any other or different standards.[164]

## S.    Procedural History

On October 9, 2018, Plaintiffs initiated this action through the filing of a Verified Complaint.[165]  Plaintiffs filed a First Amended Verified Complaint (the "Amended Complaint") on January 14, 2019.[166]

On September 26, 2019, and January 29, 2020, the Court issued decisions granting in part and denying in part Defendants' motions to dismiss, dismissing a derivative breach of fiduciary duty claim and dismissing in part aspects of Plaintiffs' claims for breach of contract, fraud, and aiding and abetting.  *See MKE Hldgs. Ltd. v. Schwartz* (*MKE I*), 2019 WL 4723816, at *13 (Del. Ch. Sep. 26, 2019); *MKE II*,

---

[164] *Id.* at 42–43 (Section 6.4(e)).

[165] PTO ¶ 80.

[166] First Am. Verified Compl. [hereinafter Am. Compl.], Dkt. 27.

2020 WL 467937, at *16.  What remains are claims for (1) fraud against defendants Schwartz, Buckeridge, Dassios, Browne, Berendes, Grow, and Corbacho, (2) breach of the Operating Agreement against those same individuals, and (3) aiding and abetting fraud against Paine.[167]

On February 14, 2024, Defendants filed a motion for summary judgment on the remaining claims, which the Court denied on August 28, 2024.  *MKE Hldgs. Ltd. v. Schwartz* (*MKE III*), 2024 WL 3964332, at *4 (Del. Ch. Aug. 28, 2024).

Four days before trial, on September 11, 2025, Plaintiffs filed a letter with the Court explaining that Defendants had belatedly produced a copy of a notebook collected from Grow that included his handwritten notes concerning the SFP Transaction ("Grow's Notebook").[168]  On September 13, the Court issued minute orders instructing that Grow would "testify last to provide Plaintiffs additional time to review the belatedly produced notes" and "Defendants may not introduce or use the notes at trial, except if Plaintiffs question a witness about any portion of the

---

[167] *See id.* ¶¶ 124–77; *see also* Order Implementing Rulings on Mot. to Dismiss, Dkt. 63 (implementing the dismissal rulings in *MKE I* and *MKE II*).

[168] 9-12-2025 Ltr. from Thomas E. Hanson, Jr. Regarding Production of Handwritten Notes [hereinafter Handwritten Notes Ltr.], Dkt. 220.

notes, Defendants may ask follow up questions about that portion of the notes only."[169]

The Court held a five-day trial from September 15 through September 19.[170] On December 19, Plaintiffs filed a Motion for Sanctions, seeking additional relief to address Defendants' belated production of Grow's Notebook.[171] The parties completed post-trial briefing on January 12, 2026.[172] The Court heard post-trial oral argument, as well as argument on the Motion for Sanctions, on February 6.[173]

## II. ANALYSIS

The parties proceeded to trial on Plaintiffs' claims for (1) fraud against defendants Schwartz, Buckeridge, Dassios, Browne, Berendes, Grow, and Corbacho, (2) breach of the Operating Agreement against those same individuals, and (3) aiding and abetting fraud against Paine.

I begin by addressing Defendants' affirmative defense that Plaintiffs' claims are untimely and find that the claims are, indeed, time-barred. For the sake of completeness, I also resolve Plaintiffs' claims on the merits, concluding that

---

[169] 9-13-2025 Minute Orders Responding to Mr. Hanson's Letter [hereinafter Handwritten Notes Minute Orders], Dkts. 225–27.

[170] Dkt. 232.

[171] Pls.' Mot. for Sanctions, Dkt. 248.

[172] *See* POB; DB; Pls. MKE Hldgs. Ltd. and David W. Bergevin's Reply Post-Trial Br., Dkt. 252.

[173] Dkt. 263.

Plaintiffs failed to prove fraud, breach of contract, or aiding and abetting fraud. Finally, I address the Motion for Sanctions.

## A. Plaintiffs' Claims Are Untimely.

Over the course of the litigation and through trial, Defendants have maintained that Plaintiffs' claims are time-barred because they were filed after expiration of the analogous statute of limitations. Plaintiffs, in response, have argued that the limitations period was equitably tolled and this action is therefore timely. At earlier stages of the proceedings, Plaintiffs received the procedural benefit of plaintiff-friendly inferences. On a full record, the Court finds that Plaintiffs were on inquiry notice of their claims and the action is time-barred.

Courts of equity apply statutes of limitations by analogy to determine whether a claim is time-barred under the equitable doctrine of laches. *Kraft v. WisdomTree Invs., Inc.*, 145 A.3d 969, 975 (Del. Ch. 2016). When, as here, a plaintiff in the Court of Chancery brings a legal claim seeking legal relief, "[t]he time fixed by the statute of limitations is deemed to create a presumptive time period in which a plaintiff must bring a claim." *Vichi v. Koninklijke Philips Elecs., N.V.* (*Vichi II*), 85 A.3d 725, 788 (Del. Ch. 2014).

The applicable limitations period for claims of fraud and breach of contract is three years. *See Largo Legacy Gp., LLC v. Charles*, 2021 WL 2692426, at *9 (Del. Ch. June 30, 2021) ("For cases in equity alleging . . . fraud[] or breach of contract

. . . Delaware courts have looked to the analogous three-year statute of limitations period established by 10 *Del. C.* § 8106." (citing *Vichi v. Koninklijke Philips Elecs., N.V.* (*Vichi I*), 2009 WL 4345724, at *15–16 (Del. Ch. Dec. 1, 2009))); *see also Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 1594085, at *12 (Del. Ch. June 29, 2005) ("The applicable statute of limitations contained in 10 *Del. C.* § 8106 imposes a three-year period of limitations on tort, contract, and fiduciary duty claims, and that three-year period applies by analogy to proceedings in equity.").

The claims at issue in this action accrued no later than July 1, 2014, when the SFP Transaction closed.[174] *Winklevoss Cap. Fund, LLC v. Shaw*, 2019 WL 994534, at *5 (Del. Ch. Mar. 1, 2019) ("[A] claim for common law fraud accrues on the day the misrepresentation is made."); *Sykes v. Touchstream Techs., Inc.*, 2024 WL 1299928, at *10 (Del. Ch. Mar. 27, 2024) ("A claim for breach of contract does not accrue until the breach occurs."); *see also ISN Software Corp. v. Richards, Layton & Finger, P.A.*, 226 A.3d 727, 732 (Del. 2020) ("Delaware is an 'occurrence rule' jurisdiction, meaning a cause of action accrues 'at the time of the wrongful act, even if the plaintiff is ignorant of the cause of action.'" (citations omitted)). Yet Plaintiffs

---

[174] Plaintiffs' claims based on omissions might be said to have accrued on July 1, 2014, upon closing of the SFP Transaction. Their claims based on affirmative representations accrued sooner—when they received the Co-Invest Presentation, the Dean Report, and Paine's Financial Model on April 10, 2014, and when they received the Ratings Agency Presentation on June 1, 2014.

waited until October 9, 2018—more than four years later—to file this lawsuit. Plaintiffs' claims are time-barred unless the statute of limitations was tolled.

"Under these circumstances, [Plaintiffs] bear[] the burden" to prove by a preponderance of the evidence "that one of the tolling doctrines adopted by Delaware courts applies[] and that [their] claims, therefore, were still timely when filed." *Vichi II*, 85 A.3d at 788. Plaintiffs raise two theories under which the statute of limitations purportedly was tolled. They argue that the limitations period was tolled under the doctrine of equitable tolling, because Plaintiffs reasonably relied on Defendants as fiduciaries, and that Defendants fraudulently concealed their fraud and contractual breaches until the QOE Report was produced in response to MKE's books and records demand. The problem with both theories is that neither can apply if Plaintiffs were on inquiry notice of their claims.

A limitations period is tolled only "until the plaintiff is on inquiry notice of their cause of action." *Microsoft Corp. v. Amphus, Inc.*, 2013 WL 5899003, at *17 (Del. Ch. Oct. 31, 2013). Inquiry notice arises when "persons of ordinary intelligence and prudence would have facts sufficient to put them on inquiry which, if pursued, would lead to the discovery of the injury." *MKE II*, 2020 WL 467937, at *12 (emphasis omitted). Inquiry notice does not require awareness of every relevant fact. *See Gallagher Indus., LLC v. Addy*, 2020 WL 2789702, at *13 (Del. Ch. May 29, 2020) ("A plaintiff need not be aware of 'all of the aspects of the alleged

36

wrongful conduct.'" (quoting *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *7 (Del. Ch. July 17, 1998))). Instead, "a plaintiff is put on 'inquiry notice' by 'facts that ought to make [it] *suspect* wrongdoing.'" *Id.* (alterations in original) (quoting *Pomeranz v. Museum P'rs, L.P.*, 2005 WL 217039, at *13 (Del. Ch. Jan. 24, 2005)).

The trial record demonstrates that Plaintiffs likely were on inquiry notice of their claims by April 10, 2014, but in any event, no later than October 15, 2014. On April 10, 2014, Blanding received a copy of the Co-Invest Presentation and Paine's Financial Model, both of which disclosed that Verdesian had retained KPMG to assist with diligence and that KPMG was preparing a quality of earnings report. Specifically, the Co-Invest Presentation disclosed that "KPMG [was] performing [a] quality of earnings analysis on [the] combined [Verdesian-SFP] company."[175] In addition, Paine's Financial Model reflected EBITDA adjustments made as a result of the Draft QOE Report.[176] These documents put Plaintiffs on notice not only of the existence of the QOE Report—which would have revealed the Bulk and Early Fill Programs about which Plaintiffs complain—but also of the magnitude of the quality of earnings adjustments therein.[177] *See Gallagher*, 2020 WL 2789702, at

---

[175] JX 146 at 12; JX 225 at 12.

[176] JX 225 (native) at Tab "SFP," Cell H93.

[177] Notably, Plaintiffs do *not* claim that the adjustments made by KPMG, as reflected in Paine's Financial Model, were improper; Plaintiffs claim only that they were not disclosed.

*14, *15 (finding equitable tolling did not apply where the plaintiffs "had an obligation to diligently investigate and w[ere] on notice of everything to which such an investigation would have led," explaining that "[i]f [plaintiff] wanted to investigate the injury it already suspected, it knew exactly where to look and exactly who to ask for that information"); *Sunrise Ventures, LLC v. Rehoboth Canal Ventures, LLC*, 2010 WL 363845, at *7 (Del. Ch. Jan. 27, 2010) (finding limitations period was not equitably tolled where the plaintiff "had notice of the existence of" an environmental report through which it "could have easily discovered the problems it identifies about which he now complains").

Materials received before and after closing also put Plaintiffs on notice of the potential impact the Bulk and Early Fill Programs could have on SFP's sales. For instance, on June 1, 2014, Plaintiffs received the Ratings Agency Presentation, which disclosed that SFP's sales decline in early 2014 was "driven in part by transition . . . from spring planting season to autumn as part of an Early Fill program[.]"[178] After closing, Plaintiffs continued to receive materials addressing the Bulk and Early Fill Programs. Materials provided in connection with the August 2014 Board of Managers meeting identified the "2013 'load program'" and "[h]igh

---

[178] JX 335 at 53. *See* Tr. (Bergevin) at 406:18–407:2 ("Q. Does that state to you there is a risk that fiscal year '13 includes a one-time benefit? A. Yes.").

retail inventory levels" as "concerns."[179]   Similarly, Blanding received materials

circulated in connection with the October 2014 Board of Managers meeting that

noted "4.1M loaded in 4th quarter of 2013 at the direction of [SFP's former CEO]"

as a concern and described "SFP Sales Challenges," including customers with "high

inventories" in part due to the "[e]arly fill" programs.[180]

Taken together, the information provided in these materials put Plaintiffs on

inquiry notice that the Bulk and Early Fill Programs might have caused a one-time

sales benefit, as described in the QOE Report.  Indeed, Plaintiffs admitted at trial

that the information they received in these materials put them on notice of the facts

central to their claims.[181]

To summarize, the trial record reflects that Plaintiffs were on inquiry notice

of their claims more than three years before they filed this action.  Plaintiffs failed

to meet their evidentiary burden to prove otherwise.  Even if Plaintiffs' claims were

timely, however, they also fail on the merits, as explained next.

---

[179] JX 434 at 28; *see also id.* at 33 (noting the "Bulk Program" and "Early Fill Tote Program").

[180] JX 451 at 4–5.

[181] *See* JX 594 (Blanding) at 332:17–333:12 (acknowledging that the October 2014 board materials disclosed that SFP's prior management had "grabbed 4.1 million in 2014 sales and shoved it into the fourth quarter of 2013," which Blanding would have recognized as a concern in July 2014); Tr. (Bergevin) at 401:7–402:18 (testifying that between six months to a year after closing, Bergevin knew that SFP had "pre-sold a lot of product," which "pulled some sales forward" from 2014 into 2013).

**B.     Plaintiffs Failed To Prove Their Claim For Fraud.**

Plaintiffs' primary contention in this action is that Schwartz, Buckeridge, Dassios, Browne, Berendes, Grow, and Corbacho defrauded Plaintiffs into contributing additional capital to Verdesian to partially fund the SFP Transaction by making false statements and omitting material information about the Bulk and Early Fill Programs.

Under Delaware law, a claim for fraud has five elements:

> (1) a false statement, generally of fact, made by the defendant; (2) the defendant's knowledge or belief that the statement was false at the time it was made, or the defendant's reckless indifference to [the] statement's truth; (3) the defendant's intent to cause the plaintiff to act or refrain from acting as a result of the statement; (4) the plaintiff's justifiable reliance on that statement in acting or in refraining from acting; and (5) damages incurred as a result of that reliance.

*Neurvana Med., LLC v. Balt USA, LLC*, 2020 WL 949917, at *23 (Del. Ch. Feb. 27, 2020) (citations omitted).  The first element—a fraudulent statement—is not limited to "overt misrepresentations."  *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983).  Fraud "may also occur through deliberate concealment of material facts, or by silence in the face of a duty to speak."  *Id.*  "A 'party to a business transaction is under a duty to . . . disclose to the other [party] before the transaction is consummated . . . subsequently acquired information that [the speaker] knows will make untrue or misleading a previous representation that when made was true . . . .'"

40

*In re Wayport, Inc. Litig.*, 76 A.3d 296, 323 (Del. Ch. 2013) (emphasis omitted) (quoting Restatement (Second) of Torts § 551 (1997)).

As set forth below, Plaintiffs failed to prove that Defendants made a false statement or omitted material information knowingly, intentionally, or with reckless indifference to the truth.

### 1.    The Alleged Misrepresentations And Omissions

In post-trial briefing, Plaintiffs identify at least nine purported misrepresentations or omissions about the Bulk and Early Fill Programs on which they base their fraud claim.

First, Plaintiffs contend that Defendants failed to inform Plaintiffs of a December 17, 2013, email in which Steinbrueck first raised the Bulk and Early Fill Programs with Verdesian.[182] Although Plaintiffs characterize Steinbrueck's email as a "warning," his email explained that "management ha[d] been working on [the Bulk and Early Fill Programs] for a year or two and they [we]re very pleased with the results."[183] And while Plaintiffs contend that Steinbrueck's email "warning" triggered Defendants' duty to disclose, the email predated any statements made to Plaintiffs and did not render any subsequent communication misleading.[184]

---

[182] *See* JX 67 at 1; POB at 58–59.

[183] JX 67 at 1.

[184] DB at 36–37.

Second, Plaintiffs argue that the Co-Invest Presentation shared with Plaintiffs "falsely" projected that SFP's revenue would increase when, in fact, revenue in the first quarter of 2014 declined.[185]  As Defendants point out, Browne told Plaintiffs that the financial information reflected in the Co-Invest Presentation was "a little stale," and Plaintiffs later received materials with updated financial information.[186]

Third, Plaintiffs claim that the Dean Report falsely represented that United Suppliers expected to grow their business with SFP by 20% when that was not true, and omitted any discussion of the Bulk and Early Fill Programs.[187]  In fact, the record shows United Suppliers did expect SFP's business to grow,[188] while nothing in the record indicates Dean ever expressed concerns about the Bulk and Early Fill Programs.[189]

Fourth, Plaintiffs contend that Paine's Financial Model was false or misleading because it did not describe KPMG's "Q[O]E adjustments" in greater detail.[190]  The document disclosed not only the net adjustment made based on the

---

[185] POB at 55.

[186] *See* JX 225 at 1, 4; JX 335 at 58 (containing updated, lower projections); DB at 37–38.

[187] POB at 56, 58.

[188] *See* JX 398 at 2.

[189] *See* JX 225 at 136 (discussing the "Early Fill Program" and the "Bulk Program" but not identifying any issues with those programs); DB at 39–40.

[190] POB at 61.

Draft QOE Report, but further broke down that net adjustment into one positive and two negative adjustments.[191] Plaintiffs fail to explain what other details should have been included in the financial model.

Fifth, and central to this case, Plaintiffs argue that Defendants had a duty to disclose the QOE Report, which described the Bulk and Early Fill Programs in detail.[192] Defendants counter that the QOE Report was not material in the overall context of the SFP Transaction and did not render any other statement misleading.[193] As Defendants point out, the QOE Report was provided to lenders and co-investors, and the equity raise was two times oversubscribed.[194]

Sixth, Plaintiffs contend that the Ratings Agency Presentation contained misstatements.[195] Specifically, Plaintiffs argue that the Ratings Agency Presentation (1) included a historical revenue chart depicting increasing revenue when Defendants knew SFP's sales were flat;[196] (2) falsely stated that Defendants expected a "meaningful [sales] uptick in summer and fall" because underperformance had been partially driven by a "transition of portion of business from spring . . . to autumn

---

[191] JX 225 (native); DB at 40–41.

[192] POB at 58–62.

[193] DB at 41–47.

[194] *Id.* at 42–43.

[195] POB at 55–56.

[196] *Id.* at 55.

43

as part of an Early Fill program";[197] and (3) falsely attributed SFP's sales decline to bad weather when it stated that Defendants expected "strong performance through 2014" because "[p]lantings have finally caught up."[198] Defendants respond, convincingly, that (1) the historical revenue chart showed combined results for Verdesian and SFP, not SFP alone; (2) nothing in the record suggests Defendants did not honestly expect an increase in sales due to the Bulk and Early Fill Programs; and (3) the same is true of Defendants' belief that weather contributed in part to SFP's sales decline.[199]

Seventh, Plaintiffs claim that Grow made false oral statements to Plaintiffs. Plaintiffs claim that Grow told Blanding he "saw no red flags" with SFP,[200] represented that SFP's "numbers were down" because "the weather was wrong,"[201] and generally failed to disclose "anything negative" about SFP to Plaintiffs before

---

[197] *Id.* at 56.

[198] *Id.*

[199] DB at 48–52. *See supra* notes 63, 66.

[200] JX 599 (Bergevin) at 101:10–21.

[201] *Id.* at 160:13–19.

44

closing.[202]  At trial, Plaintiffs failed to prove by a preponderance of the evidence that Grow made these statements more than a decade ago.[203]

Eighth, Plaintiffs assert that Defendants concealed an email from Verdesian's Chief Operating Officer, Greg Thompson, expressing skepticism that SFP's sales could grow by 20%.[204]  But Defendants did not represent to investors that they believed SFP could achieve that level of growth.  The "Base Case" included in Paine's Financial Model, which was also included in the Ratings Agency Presentation, projected 10% sales growth,[205] while even the "Dean Case" projected only 18% sales growth for SFP.[206]

Ninth, and finally, Plaintiffs argue that Defendants failed to disclose to Plaintiffs that United Suppliers "warn[ed]"[207] Thompson that it had "higher than expected inventory" in June 2014.[208]  Notably, despite receiving this purported

---

[202] JX 594 (Blanding) at 261:1–11.

[203] DB at 53–54.  Unsurprisingly, at trial, witnesses on several occasions were unable to recall specific conversations that purportedly took place more than a decade ago. *See, e.g.*, Tr. (Blanding) at 121:10–21, 127:3–128:7, 161:3–24; *id.* (Bergevin) at 240:4–8; *id.* (Grow) at 1174:7–14.

[204] POB at 63–64.

[205] JX 225 (native); JX 335 at 57.

[206] JX 225 (native) at Tab "SFP," Cell O38.

[207] This is Plaintiffs' characterization.  POB at 63.  Thompson did not consider this conversation a "warning."  Tr. (Thompson) at 269:23–24 ("I wouldn't say it was a warning.").

[208] *Id.* at 268:5–12.

"warning," Thompson himself elected to invest 60% of his transaction bonus in the SFP Transaction.[209]

As should be apparent from the summary above, Defendants make strong arguments in response to each of the nine purported misrepresentations and omissions Plaintiffs have raised. I need not definitively decide whether Defendants made any false representations, however, because as explained next, Plaintiffs utterly failed to prove scienter.

### 2. Plaintiffs Failed To Prove Scienter.

"As a matter of Delaware law, fraud 'require[s] a certain level of scienter on the part of the defendant; a misrepresentation must be made either knowingly, intentionally, or with reckless indifference to the truth.'" *Arwood v. AW Site Servs., LLC*, 2022 WL 705841, at *20 (Del. Ch. Mar. 9, 2022) (alteration in original) (quoting *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 143 (Del. Ch. 2004)). "The plaintiff must also prove that the defendant intended to induce reliance." *Id.* (emphasis omitted). In this way, "[f]raud depends on a subjective test. The defendant must be shown to have had a culpable state of mind." *Id.* (quoting Restatement (Third) of Torts: Liab. for Econ. Harm § 10 cmt. a (2020)).

---

[209] JX 353 at 1.

Whether a defendant acted with the necessary state of mind to support fraud is a fact-intensive inquiry.

To frame the question of scienter here, it is helpful to step back and consider Plaintiffs' theory of fraud. As described above, Plaintiffs argue that principals of Verdesian and Paine made false statements and omitted material information about SFP's Bulk and Early Fill Programs in order to induce Plaintiffs to contribute capital to Verdesian to fund the SFP Transaction. Plaintiffs contend that disclosures about the Bulk and Early Fill Programs would have revealed that the SFP Transaction was a poor investment, and they would not have contributed additional capital to facilitate it.[210] According to Plaintiffs, Defendants intentionally misrepresented or concealed the Bulk and Early Fill Programs in order to hide a key driver of SFP's declining financial condition. At bottom, Plaintiffs argue that Paine and Verdesian intentionally or recklessly pursued a bad deal, and misrepresented information uncovered in diligence to induce investors (including Plaintiffs) to support the deal anyway.

At the threshold, this theory butts up against logic and common sense. Plaintiffs ask the Court to find that several Defendants intentionally or recklessly took action contrary to their own economic interests. Paine and its affiliates invested

---

[210] *See, e.g.*, POB at 4.

$45.4 million in new capital to facilitate the SFP Transaction.[211] Grow voluntarily invested a transaction bonus he received in the SFP Transaction into Verdesian Class M units, which ultimately became worthless due to Verdesian's decline in value.[212] Browne, who primarily oversaw Paine's diligence efforts, personally invested in the capital raise as well.[213] Yet, by Plaintiffs' account, those individuals knew, and intentionally misrepresented information about, SFP's Bulk and Early Fill Programs in order to hide SFP's deteriorating financial condition.

The fact that Verdesian and Paine undertook extensive diligence efforts prior to closing the SFP Transaction—including retaining both Dean and KPMG to conduct analyses and prepare reports, and engaging with United Suppliers on multiple occasions—undercuts any notion that Defendants intentionally or recklessly pursued a poor investment. What is more, the record shows that Defendants viewed the information learned in diligence, on the whole, as overwhelmingly positive. For instance,

- The Co-Invest Presentation described Verdesian's diligence process and made a preliminary case for the SFP Transaction, highlighting

---

[211] JX 390 at 3–4.

[212] *See id.*

[213] Tr. (Browne) at 810:24–811:7.

positive "[SFP] Management-projected 2014 revenue and EBITDA," patented technology, and "cross-selling potential."[214]

- Browne viewed the Dean Report—based on interviews with customers, certified crop advisors, and academics; discussions with Verdesian and SFP management; and other company and industry data[215]—as "overwhelmingly favorable."[216]

- Browne viewed the Draft QOE Report as a "good result."[217]

- Grow thought, based on the diligence received, that the Bulk and Early Fill Programs "ha[d] been a success."[218]

- The deal team provided Paine's investment committee with materials summarizing the results of the due diligence process,[219] which described diligence as "favorable" and concluded that the SFP Transaction presented a "[v]ery attractive return profile."[220] The same

---

[214] JX 146 at 4; JX 225 at 4.

[215] *Id.* at 55.

[216] Tr. (Browne) at 767:20–21; *id.* (Grow) at 1065:5–8; *see also id.* (Browne) at 767:20–768:4 ("I mentioned that the Dean [R]eport on the market sizing produced . . . 23 percent revenue CAGR . . . . [V]ery rare to have a third party come in and believe that the management sales case was actually conservative.").

[217] JX 193.

[218] JX 226 at 1.

[219] JX 283 at 2.

[220] *Id.* at 4.

materials described the Dean Report as "[v]ery thorough work" with "[f]indings [that were] very positive[.]"[221]

- At trial, the two individuals primarily responsible for driving the SFP Transaction, Browne and Grow, each credibly testified that they believed the deal made good economic sense for Verdesian and Paine.[222]

Moreover, Plaintiffs' theory that Defendants intentionally or recklessly concealed information about the Bulk and Early Fill Programs because they knew

---

[221] *Id.*; *see also* JX 225 at 238 (projecting 18.2% CAGR for net revenue from 2013 through 2018); *id.* at 63 ("The individual retailer[s] were very passionate about the product and highly positive about their relationship with SFP[.]"); Tr. (Browne) at 732:11–19 ("I think, at SFP, that Dean thought that there was an enormous opportunity, kind of 20 percent-plus growth.").

[222] *See, e.g.*, Tr. (Browne) at 772:5–8 ("My reaction is that's the way that private equity firms work, is that there's a financial incentive to do good deals and earn incentive compensation on those deals."); *id.* at 810:21–23 ("My incentive was just to try to do and be associated with good deals so I could rise through the ranks at Paine."); *id.* at 811:10–18 ("Q. And what about Paine? What was its incentive in closing the acquisition? A. Very similar. To do good deals with the hope of earning the kind of carry incentive that we were talking about for the deal itself. But also to build a track record to get good deals done to, you know, raise—have a good track record on which to raise future funds and carry on their private equity business."); *id.* at 828:15–18 ("[B]ecause we thought it was a good deal that was going to increase value for all of the A units, and also for people holding these various incentives."); *id.* (Grow) at 1140:2–6 ("Q. Did you think you could hoodwink some other buyer to take a bad business from you? A. Not at all. That's not the way it works in private equity. You have very, very smart purchasers of businesses."); *id.* at 1144:4–7 ("A. I believed it was a good deal. Q. Would you have done the deal if you didn't think it was a good deal? A. Absolutely not."); *id.* at 1144:14–15 ("It makes no sense at all. Why would I do a bad deal thinking I was going to get a gain?").

such information would reveal that SFP was a bad investment cannot be squared with the fact that Defendants voluntarily provided the QOE Report to lenders and institutional investors, the primary source of funding for the SFP Transaction.[223] Institutional investors committed nearly $100 million in equity to fund the SFP Transaction, while preemptive rights holders, including Plaintiffs, invested just over $10 million in an equity raise that was already oversubscribed.[224] Defendants had no reason to induce Plaintiffs to participate in the capital raise with misrepresentations about information that was provided to the primary financial sources in the transaction.

Despite these logical and factual hurdles, Plaintiffs raise numerous arguments to support a finding of scienter, all of which fail to convince me that Defendants intentionally or recklessly misrepresented or omitted information to induce Plaintiffs' investment.

First, Plaintiffs argue that Defendants' financial interests in the SFP Transaction were not aligned with other investors, including Plaintiffs, such that Defendants had an incentive to close the SFP Transaction even after learning that the Bulk and Early Fill Programs were driving SFP's deteriorating financial

---

[223] JX 390 at 4.

[224] JX 283 at 3.

51

performance. Plaintiffs point out that Paine received a $6 million transaction fee by closing the SFP Transaction, and that the large size of the deal helped contribute to a $1 million increase in the service fees that Verdesian paid to Paine going forward.[225] Those relatively low fees do not explain why Paine and its affiliates would intentionally or recklessly risk the $45.4 million they invested in connection with the SFP Transaction.

Separately, Plaintiffs argue that Defendants were eager to enter into the SFP Transaction regardless of the known risks because they expected to promptly sell Verdesian to a third party. While the record shows Paine anticipated an *eventual* sale of Verdesian,[226] Plaintiffs' quick-sale theory makes little sense. If the Bulk and Early Fill Programs shifted sales from the spring of 2014 into the fall of 2013, the effect would be evident by April or May 2014.[227] Thus, to hide the impact of the Bulk and Early Fill Programs, Paine would have needed to sell Verdesian in early

---

[225] *See* PTO ¶ 73.

[226] *See* JX 73 at 4; JX 76 at 1; *see* Tr. (Browne) at 715:4–10.

[227] As KPMG noted in the QOE Report, its negative *pro forma* adjustment for the impact of the Bulk and Early Fill Programs would "roll off after [April 2014]." JX 240 at 11. As Browne explained: "This entire [Bulk and Early Fill Program] adjustment, as KPMG noted in its own language, involved the potential transfer of some sales from the first quarter of 2014 into the back half of 2013. But when you looked at the LTM period as of March or April, that all happened inside the same 12-month period." Tr. (Browne) at 748:23–749:4.

May 2014—the same month Verdesian signed the Purchase Agreement for SFP. Plaintiffs' theory does not hold water.

Second, Plaintiffs argue that Defendants intentionally misrepresented and withheld information about the Bulk and Early Fill Programs so that Plaintiffs would not attempt to "rais[e] legal challenges" and block the deal.[228] As Vice Chancellor Glasscock noted at an earlier stage of this case, Plaintiffs offer no theory to explain how they could have prevented the transaction, as their only conceivable claim would have been one for "overpayment."[229]

Third, at trial, Plaintiffs introduced expert testimony opining that a desire to maintain "deal momentum" could cause a transaction participant to misrepresent or conceal negative information discovered in diligence.[230] The deal timeline disproves that theory in this case, however. By April 25, 2014, Goldman Sachs had already agreed to underwrite $225 million in debt financing for the deal and outside investors had committed to invest $122 million in equity.[231] Preemptive rights holders did not receive the Notice notifying them of their right under the Operating Agreement to

---

[228] POB at 68.

[229] JX 633 at 45:15–21.

[230] POB at 67.  Despite that expert testimony, nothing in the record suggests that "deal momentum" was a factor for the parties here.

[231] JX 283 at 3.

participate in the equity raise until more than a month later, on June 1.[232]  By that time, the preemptive rights holders' investment was unnecessary because the equity raise was already two times oversubscribed.[233]  Indeed, when Bergevin partially withdrew his investment days before closing, Browne reassured his advisor that, "[i]n truth, the math actually worked better with the lower funding[.]"[234]  The notion that Defendants sought to maintain "deal momentum" by withholding negative information from Plaintiffs, when investment from preemptive rights holders was unnecessary to the deal, makes little sense under these facts.

Fourth, Plaintiffs claim that Defendants used Plaintiffs' participation in the capital raise to "promot[e]" the SFP Transaction to other investors.[235]  The sole support in the record for this argument is an email in which a co-investor asked Browne for "the members of the existing senior management (or other important parties) that are expected to participate in this equity round," and Browne responded that "Mike Blanding, who is the former owner of INTX and head of our inoculants

---

[232] JX 335 at 2, 4.

[233] JX 283 at 3.

[234] JX 394 at 1; *see also* Tr. (Browne) at 786:21–787:14 ("Q. [A]ll else being equal, would you have preferred that the preemptive rights holders exercised their rights or not exercised their rights?  A. We would have preferred that they not . . . .  [W]e would rather give . . . [an] allocation to those [institutional] investors versus the preemptive rights holders who everything that they took up would be coming dollar for dollar out of these other clients of the firm.").

[235] *See* POB at 3, 29 & n.6.

business at Verdesian, is also expected to participate."[236]  This email shows only that Browne gave a truthful response to a direct question.  It does not suggest Defendants "promoted" Plaintiffs' participation in the capital raise.

Fifth, Plaintiffs contend that Defendants' post-transaction conduct shows they attempted to conceal their alleged misconduct.[237]  The record does not reflect any attempt to conceal misconduct related to the SFP Transaction.  To the contrary, materials sent to Plaintiffs in connection with August, October, and December 2014 meetings of Verdesian's Board of Managers included discussion of SFP's financial performance as well as the Bulk and Early Fill Programs.[238]  Plaintiffs argue that Verdesian "stonewalled" MKE's October 2017 books and records demand, but also admit that Verdesian voluntarily produced the QOE Report on which their claims are based in response to that demand.

Finally, Plaintiffs argue that Defendants—and in particular, Browne—directed KPMG to "soften" the QOE Report because he knew that the Bulk and Early Fill Programs highlighted a critical risk in the SFP Transaction that he wished to hide.[239]  Far from suggesting ill intent, the record shows that Browne disagreed with

---

[236] JX 167.

[237] POB at 68.

[238] *See supra* pp. 37–39.

[239] POB at 67–68.

aspects of KPMG's analysis[240] and sincerely believed that the Bulk and Early Fill Programs presented a "timing issue" that would not have a lasting impact on SFP's future sales.[241]

Plaintiffs take particular issue with a slide in the Ratings Agency Presentation that Browne drafted to explain this viewpoint, which stated: "SFP underperformance y-o-y [was] driven in part by transition of portion of business from spring planting season to autumn as part of an Early Fill program. Expect meaningful uptick in summer and fall months."[242] Plaintiffs make noise over an early handwritten draft of this slide, in which Browne crossed out additional language clarifying that sales had transitioned from "2014 planting season to 2013 autumn."[243] Viewed in context, the slide is not misleading, nor am I convinced that Browne deleted language from the draft slide with the intention to mislead. Additionally, Plaintiffs claim that Browne used this slide to press a false "weather narrative,"[244] pointing to language that "[p]lantings have finally caught up" such that the "Early Fill program at SFP

---

[240] JX 244 (noting that Browne and KPMG "[ha]d a disagreement" about the negative earnings adjustment made to account for the Bulk and Early Fill Programs).

[241] JX 195 at 1 (referring to "a timing issue that KPMG has its knickers in a knot about").

[242] JX 318 at 3; JX 335 at 53.

[243] POB at 32 (quoting Tr. (Browne) at 800:4–7); *see id.* at 69 (referring to the slide as "Browne's fraudulent sketch for the [Ratings Agency Presentation]").

[244] *Id.* at 62.

[was] expected to drive strong performance."[245]   The record does not support

Plaintiffs' contention that weather played no factor in SFP's sales decline.[246]

For these reasons, Plaintiffs failed to prove by a preponderance of the

evidence that Defendants intentionally or recklessly misrepresented or omitted

information to induce Plaintiffs to participate in the SFP Transaction capital raise.

Having failed to prove Defendants acted with the requisite scienter, Plaintiffs failed

to prove their claim for fraud.  Judgment on that claim is entered for Defendants.

### C.  Plaintiffs Failed To Prove Their Claim For Breach Of Contract.

Plaintiffs also claim that Schwartz, Buckeridge, Dassios, Browne, Berendes,

Grow, and Corbacho breached Verdesian's Operating Agreement by acting in bad

faith.

As the Court previously held, "[t]he Operating Agreement here eschews

common-law duties" and "exculpates Managers for conflicted, negligent and other

detrimental decisions . . . so long as taken in good faith." *MKE I*, 2019 WL 4723816,

at *9.[247]   "In the place of common law fiduciary duties, the Operating Agreement

---

[245] JX 318 at 3; JX 335 at 53.

[246] JX 179 at 1; *see supra* notes 63, 66.

[247] *See also* JX 229 at 42 (Section 6.4(b)) ("[A] Manager shall perform his duties as a manager in good faith, in a manner he reasonably believes to be in or not opposed to the best interests of the Company . . . .").

imposes [a] contractual dut[y] on the Managers" to act in good faith—or, as the parties have framed the issue, a duty not to act in bad faith. *Id.*

Like scienter, bad faith requires a "tortious state of mind"—"the conscious doing of a wrong because of dishonest purpose or moral obliquity." *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1208 & n.16 (Del. 1993); *see also In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 64 (Del. 2006) (explaining that "subjective bad faith" includes "fiduciary conduct motivated by an actual intent to do harm"); *In re Kraft Heinz Demand Refused Deriv. S'holder Litig.*, 2024 WL 3493957, at *8 (Del. Ch. July 19, 2024) (explaining that to demonstrate bad faith, a party "must have acted with scienter—either an intent to harm or knowing indifference to the harm caused").

The parties agree that the Court's finding on scienter in connection with Plaintiffs' fraud claim is dispositive of bad faith.[248] For the same reasons Plaintiffs failed to prove that Defendants made any misrepresentation knowingly, intentionally, or with reckless indifference to the truth, Plaintiffs likewise failed to

---

[248] *See* POB at 76 ("For the same reasons Defendants' conduct constitutes fraud, it represents bad faith."); DB at 72 ("For the same reasons Plaintiffs failed to prove their fraud claim, Plaintiffs also failed to prove bad faith.").

prove by a preponderance of the evidence that Defendants acted in bad faith.[249]

Judgment on this claim is entered for Defendants.

**D.     Plaintiffs Failed To Prove Their Claim For Aiding And Abetting Fraud.**

Plaintiffs also claim that Paine aided and abetted the other Defendants' fraud. To prove a claim for aiding and abetting fraud, Plaintiffs must prove that "(1) there is an underlying fraud; (2) . . . the aiding and abetting defendants had knowledge of that fraud; and that (3) they provided substantial assistance." *Great Hill Equity P'rs IV, LP v. SIG Growth Equity Fund I, LLLP*, 2018 WL 6311829, at *45 (Del. Ch. Dec. 3, 2018).

For the same reasons Plaintiffs' fraud claim is untimely, their claim for aiding and abetting fraud is likewise time-barred.[250] *See Isaac v. Politico LLC*, 346 A.3d 103, 124 (Del. 2025) (affirming dismissal of aiding and abetting counterclaim as untimely where "the court correctly dismissed" the claim on which the aiding and abetting claim was predicated); *Borsody v. Gibson*, 2025 WL 1650395, at *9 (Del. Ch. June 11, 2025) (concluding that an aiding and abetting claim was time-barred where the predicate claim was time-barred).

---

[249] *See supra* pp. 47–57.

[250] *See supra* pp. 37–39.

In addition, because Plaintiffs did not prove a predicate fraud, their claim for aiding and abetting fraud cannot stand. *See, e.g.*, *MHS Cap. LLC v. Goggin*, 2018 WL 2149718, at *10 n.126 (Del. Ch. May 10, 2018) ("Because [plaintiff's] fraud claim fails, its claim[] for aiding and abetting . . . fraud must be dismissed as well."). Judgment is entered for Defendants.

### E.  The Motion For Sanctions Is Denied.

As noted above, four days before trial, Plaintiffs filed a letter with the Court explaining that Defendants had produced a copy of Grow's Notebook the day prior.[251] To ameliorate prejudice caused by the late production, the Court prohibited Defendants (but not Plaintiffs) from introducing or using Grow's Notebook at trial, and directed that Grow would testify last at the five-day trial to provide Plaintiffs additional time to review Grow's Notebook. Although Plaintiffs were permitted to ask witnesses about the document, they chose not to do so.

Through the Motion for Sanctions, Plaintiffs request three additional remedies. Namely, Plaintiffs ask the Court to "draw an adverse inference against Defendants on the element of scienter for Plaintiffs' fraud claim," "elevate Defendants' burden of proof to clear and convincing evidence on all elements of Defendants' affirmative defenses," and award Plaintiffs their reasonable attorneys'

---

[251] Handwritten Notes Ltr.

fees and costs in bringing the Motion for Sanctions.[252] These remedies, I find, are unwarranted.

"[T]he purpose of discovery is to advance issue formulation, to assist in fact revelation, and to reduce the element of surprise at trial." *Levy v. Stern*, 1996 WL 742818, at *2 (Del. Dec. 20, 1996) (TABLE). Discovery deadlines of course play an important role in avoiding trial by surprise and minimizing prejudice that could result from belated disclosure.

Defendants did not offer a compelling reason for failing to produce Grow's Notebook before the discovery cut-off. The error could and should have been avoided by asking Grow early in the discovery period whether he kept handwritten notes. And Defendants' failure to produce Grow's Notebook until days before trial was prejudicial. That is why the Court prohibited Defendants from introducing the document at trial. But because Grow's Notebook was preserved and ultimately produced, Plaintiffs had the chance to question witnesses about it. They chose not to do so for tactical reasons, and I do not fault their strategy; but I cannot assume that had they asked the right questions, the testimony elicited would have proven their case.

---

[252] Mot. for Sanctions at 12–13.

At the end of the day, it is my strong view that "[t]he purpose of the adversary system is to seek the truth," not to impose sanctions for discovery foot-faults. *Hamann v. State*, 565 A.2d 924, 932 (Del. 1989); *see also Hoey v. Hawkins*, 332 A.2d 403, 405 (Del. 1975) ("[A] trial decision should result from a disinterested search for truth from all the available evidence . . . .").[253] Plaintiffs did not meet their evidentiary burden at trial to prove equitable tolling or scienter, and I am wholly unconvinced that the late production of a single document should alter that result.

To support their request for additional relief, Plaintiffs cite *Terramar Retail Centers, LLC v. Marion #2-Seaport Trust U/A/D June 21, 2002*, 2018 WL 6331622 (Del. Ch. Dec. 4, 2018). There, the Court precluded evidence as a remedy for belated production[254] but suggested in *dicta* that the plaintiff "could have requested, and [the Court] would have been justified in granting, remedies such as an adverse inference against the [defendant] or an elevated burden of proof for the [defendant]'s affirmative defenses." *Id.* at *14. Notably, *Terramar* relied in part on *In re ExamWorks Group., Inc. Stockholder Appraisal Litigation*, 2018 WL 1008439, at

---

[253] *See also Beard Rsch., Inc. v. Kates*, 981 A.2d 1175, 1193 (Del. Ch. 2009) (explaining that an adverse inference "cannot take the place of proof of a fact necessary to [a party's] case").

[254] *Contrast* Defs.' Opp'n to Pls.' Mot. for Sanctions at 12, Dkt. 253 ("[T]he notes represent only about 0.07% of the total pages of documents produced by Defendants."), *with Terramar*, 2018 WL 6331622, at *12 (sanctioning party for "dump[ing] 98.4% of its documents" on the opposing party after the deadline for substantial completion of document discovery).

*6 (Del. Ch. Feb. 21, 2018)—which acknowledges that "[m]ore typical remedies for late production are to allow additional discovery or to preclude the use of the belatedly produced material," as the Court did here—and ultimately did not order the relief that Plaintiffs seek.

Plaintiffs also request an award of fees incurred in bringing the Motion for Sanctions. "When a party violates orders of the court—including scheduling orders . . . and thereby exposes its adversary to unnecessary delay and expense, this court has the discretion to shift fees." *Wimbledon Fund LP-Absolute Return Fund Series v. SV Special Situations Fund LP*, 2011 WL 6820362, at *3 (Del. Ch. Dec. 22, 2011). In my discretion, I award Plaintiffs their reasonable fees incurred in raising the belated production with the Court prior to trial.[255] Because I find that the remedies imposed prior to trial were adequate, Plaintiffs' request for fees incurred in connection with the Motion for Sanctions is denied.

## III. CONCLUSION

For the reasons explained above, judgment is entered for Defendants.

---

[255] *See* Handwritten Notes Ltr.; Handwritten Notes Minute Orders.